UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 06-3-P-H |
| ) | **REDACTED VERSION** |
| MAXX NOBLE, ) | |
| ) | |
| **Defendant** ) | |

**MEMORANDUM DECISION AND ORDER
ON *EX PARTE* MOTION FOR PRETRIAL PRODUCTION**[1]

The government seeks an order compelling two teenagers who are not suspected of any crime to submit to a saliva swab of their mouths and provide an exemplar of their fingerprints for purposes of bolstering their credibility as witnesses in the instant prosecution of one of their acquaintances for the crime of arson. *See generally Ex Parte* Motion for Pretrial Production ("Motion") (Docket No. 64). With the benefit of *ex parte* oral argument held before me on June 2, 2006, I deny the government's unusual request, which I determine both implicates, and offends, the Fourth Amendment rights of these two individuals.

**I. Factual Background**

On December 1, 2005 Paul J. McNeil, a special agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), presented an affidavit to the undersigned in support of a criminal complaint charging Philip P. Thibault with arson in connection with the October 12, 2005 destruction of the Henry Dow Gibson Recreation Center ("Gymnasium") on the campus of Fryeburg Academy in

---

[1] This version of my opinion has been redacted to protect against disclosure of personal data identifiers and the identity of a minor witness. A full, unredacted version is being filed under seal simultaneously herewith.

Fryeburg, Maine.  *See* Affidavit of Paul J. McNeil ("McNeil Aff."), Attach. No. 1 to Motion, ¶ 1; Affidavit in Support of Criminal Complaint ("Complaint Aff."), Attach. No. 2 to Motion, ¶ 1.

In his Complaint Affidavit, McNeil relayed, *inter alia*, that:

1.     He had learned that a person he called Witness 1, or "W1," a non-boarding student at Fryeburg Academy, might have information regarding the cause of the fire.  *See* Complaint Aff. ¶ 8.  He spoke with W1 by telephone on October 20, 2005.  *See id*.  W1 told him that Thibault and another individual, Suspect 1, or "S1," had told W1 on the morning of the fire that they had set the fire in the Gymnasium.  *See id*.  W1 also told McNeil that Thibault and S1 had secreted items they had stolen from the Gymnasium just prior to its destruction in a wooded area in Fryeburg, the location of which W1 described to McNeil in detail.  *See id*.

2.     The following day, McNeil and other investigators went to the wooded area described by W1, where they found athletic equipment, including a bow and arrows, locker padlocks and cricket equipment.  *See id*. ¶ 9.  School officials identified those items as similar to equipment that had been housed in the Gymnasium.  *See id*.  Investigators also found in that area numerous candy and snack-food wrappers as well as unconsumed and partially consumed snacks, several of which appeared to be "Hostess" brand.  *See id*.  A truck containing Hostess products that was parked across the street from the Gymnasium had been vandalized, and items had been stolen from the truck, on the night of the fire.  *See id*.  The items found in the field were collected for fingerprint and other forensic testing.  *See id*.

3.     In the October 20 telephone interview and in an October 26 in-person interview with McNeil, W1 relayed further details.  *See id*. ¶ 10.  Upon learning on the morning of the fire that classes were canceled because of the fire, W1 went to the home of a friend, Witness 2, or "W2," who lived near Fryeburg Academy.  *See id*. ¶ 10(A).  Thibault and S1, both of whom W1 knew, were there.  *See*

*id*. After a while, Thibault and S1 asked to be driven to a wooded area near the Fryeburg fairgrounds where they said they had left their backpacks. *See id*. ¶ 10(B). They told W1 and W2 that the backpacks contained candy and food items. *See id*. After the group arrived at the location in W1's car, Thibault and S1 exited, then returned carrying their backpacks and other items. *See id*. W1 observed a large quantity of food items in the backpacks, as well as padlocks and what appeared to be a baseball bat in the back seat. *See id*. W1 asked Thibault and S1 whether they had stolen items from the "Hostess place" and whether they had started the fire. *See id*. Thibault and S1 eventually admitted to him and to W2 that they had in fact set the fire that had destroyed the Gymnasium. *See id*. W1 told Thibault and S1 he did not want the stolen items in his car, and they had to get rid of them immediately. *See id*. ¶ 10(C). The foursome then drove to another location in Fryeburg – the wooded area that investigators searched on October 21 – to dispose of items taken from the Gymnasium. *See id*.

        4.      McNeil interviewed W2, along with W2's parents, on October 24, 2005. *See id.* ¶ 11. Although initially denying much knowledge concerning the fire, W2 eventually confirmed that Thibault and S1 had come to W2's home early on the morning the fire occurred. *See id*. W2 confirmed that Thibault and S1 had said that morning they had set fire to the Gymnasium, and W2 confirmed seeing in their possession items that appeared to have come from the Gymnasium. *See id*.

        5.      In mid-November 2005 McNeil learned that Thibault was staying in Michigan and requested that ATF agents there attempt to interview him. *See id*. ¶ 14. Two ATF agents interviewed Thibault in Michigan on November 18, 2005. *See id*. During the interview, Thibault eventually admitted that he and another individual, whom he identified as the same person referred to as "S1," vandalized the Gymnasium, broke into a truck park nearby and stole Hostess products, reentered the Gymnasium and set it on fire, after which he and S1 went to the home of the person identified as W2. *See id*.

Thibault was arrested on December 2, 2005 in Flint, Michigan, and ordered removed to the District of Maine. *See* McNeil Aff. ¶ 2. On January 18, 2006 he waived indictment and pled guilty before United States District Court Judge D. Brock Hornby to a one-count information charging him with arson in violation of 18 U.S.C. § 844(i). *See id*. Thibault currently is housed at the Cumberland County Jail in Portland, Maine. *See id*. Thibault has identified Maxx Noble, the defendant charged herein, as the person identified in the Complaint Affidavit as "S1." *See id*. ¶ 3. The individual referred to in that affidavit as "W1" is Zachary Everett, a resident of [**REDACTED**], born on [**REDACTED**], and the individual referred to as "W2" is [R.C.], a resident of [**REDACTED**], born on [**REDACTED**]. *See id*.

Among items McNeil and other investigators recovered in the wooded area described by W1 on October 21, 2005 were four empty soft-drink containers (a Sprite can and three Sprite bottles) and an empty cigarette package. *See id*. ¶ 4. The containers were sent to the Maine State Police Crime Laboratory ("MSPCL") for fingerprint and DNA testing, and the cigarette package was sent to the MSPCL for fingerprint testing. *See id*.

McNeil has learned from discussions with, and review of reports by, Jennifer Sabean, a forensic DNA analyst with the MSPCL, that she was able to detect and recover DNA from the four soft-drink containers. *See id*. ¶ 5. Her tests revealed the presence of identical male DNA on three of the containers (the can and two of the bottles) and a mixture of two different types of male DNA on the final bottle, both different than the DNA found on the other three containers. *See id*. The bottle containing the DNA mixture had what are referred to as a "major" and a "minor" DNA profile. *See id*. Sabean was able to obtain a full 13-loci DNA profile of the identical DNA recovered from three of the containers. *See id*. ¶ 6. It is very likely she would be able to determine with a high degree of certainty whether the recovered DNA matched that of a certain individual. *See id*. Because the

4

"minor" profile is not a full 13-loci profile, the degree of certainty of a match is less than with a full profile. *See id*.

Thibault voluntarily provided McNeil with a blood sample on March 9, 2006. *See id*. ¶ 8. McNeil obtained a blood sample from Noble pursuant to a search warrant issued on March 13, 2006. *See id*. McNeil transported both samples to the MSPCL for DNA profiling and comparison with the swabs taken of the Sprite containers. *See id*. Sabean was able to match the DNA profile obtained from Noble's blood to the "major" DNA profile found on the bottle containing the DNA mixture. *See id*. Sabean concluded that Thibault was not the contributor of the second DNA profile found on that bottle and that neither Noble nor Thibault contributed the identical male DNA found on the other three Sprite containers. *See id*.

In an interview McNeil conducted with Everett (or "W1") on March 8, 2006, Everett told McNeil that he regularly drinks Sprite and that there may have been Sprite cans in his vehicle on the day he and the others abandoned the athletic equipment in the field where it was later found. *See id*. ¶ 9. In an interview McNeil conducted with [R.C.] (or "W2") the same day, [R.C.] confirmed that he was with the group when they placed a number of items in the field. *See id*. He told McNeil he could not remember whether anyone was drinking sodas or smoking that morning. *See id*.

McNeil has learned that DNA can be obtained not only by drawing blood but also by taking an oral swab of the interior of an individual's mouth and testing it. *See id*. ¶ 10. The MSPCL has provided him with sterile swabs to use in swabbing the mouths of Everett and [R.C.]. *See id*. Administration of the swab is accomplished with a minimal amount of discomfort by running a single sterile cotton-swab stick across the interior of the mouth, a process that takes a few seconds at most.

*See id*. The collection process may be accomplished by a law-enforcement officer wearing protective gloves. *See id*.[2]

It appears likely to McNeil, given Everett's and [R.C.]'s statements, that the DNA of one or both will match the profiles recovered from the Sprite containers. *See id*. ¶ 11. If so, that would help verify their statements (as well as that of Thibault) that they were there with Thibault and Noble when items from the burned Gymnasium were abandoned the morning following the fire. *See id*. That, in turn, in McNeil's view, would constitute evidence of the commission of arson and conspiracy to commit arson by Noble. *See id*.

McNeil reviewed a report dated March 13, 2006 prepared by MSPCL forensic scientist Alicia Wilcox, in which Wilcox states that she was able to recover a latent fingerprint from the cigarette package and was unable to match the known fingerprints of either Thibault or Noble to the print thereon. *See id*. ¶ 12. In a March 9, 2006 interview, Thibault told McNeil that he, Noble, Everett and [R.C.] were smoking in the field on the morning of the fire, although he could not recall any particular brand of cigarettes anyone was smoking. *See id*. ¶ 13.

The government represents that neither Everett nor [R.C.] is a defendant or a suspect in the arson case but that each is expected to testify at Noble's trial. *See* Motion at 2.

The government initially sought a warrant for blood testing of Everett and [R.C.], which I denied for lack of probable cause. *See id*. at 2-3. It now seeks swabbing samples of their saliva for purposes of DNA testing, contending probable cause has been established, and proposes a procedure that would permit Everett and [R.C.] to challenge the court's directive to produce those samples if they chose to do so. *See id*. at 3.

---

[2] The government's proposed orders contemplate that an ATF agent would obtain the saliva and fingerprint samples. *See* Attach. Nos. 5-6 to Motion.

## II. Analysis

The Fourth Amendment commands that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As the Supreme Court has made clear, "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels – the 'seizure' of the 'person' necessary to bring him into contact with government agents and the subsequent search for and seizure of the evidence." *United States v. Dionisio*, 410 U.S. 1, 8 (1973) (citation omitted).[3]

At oral argument, counsel for the government questioned whether procedures as quick and minimally intrusive as the requested fingerprinting and oral swabbing of Everett and [R.C.] could constitute a "seizure" for Fourth Amendment purposes, suggesting that the taking of such evidence would entail no more of a restraint than a subpoena to testify at trial. Alternatively, he contended, if the contemplated swabbing and/or fingerprinting do constitute a "seizure," the request to undertake them is supported by probable cause. With respect to the "search" prong of analysis, he asserted (both in his papers and at oral argument) that the government had established probable cause to search the

---

[3] In cases involving requested surgical intrusions beneath the skin, there is yet another layer of analysis. The "ordinary requirements of the Fourth Amendment" become "threshold requirements"; if the seizure and search are themselves justified by probable cause, a court must go on to assess the reasonableness of the proposed intrusion by weighing "the individual's interests in privacy and security . . . against society's interests in conducting the procedure." *Winston v. Lee*, 470 U.S. 753, 760 (1985) (citing *Schmerber v. California*, 384 U.S. 757, 768-69 (1966)). This is so because, "[n]otwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect." *Id*. at 761 (footnote omitted). Courts have erred on the side of applying the *Schmerber* balancing test to requests for saliva samples even though, technically, procedures to collect such samples entail no intrusion beneath the skin. *See, e.g., In re Shabazz*, 200 F. Supp.2d 578, 585 (D.S.C. 2002); *United States v. Garrett*, No. 3:01-CR-43-J-20HTS, 2001 WL 483785, at *2 (M.D. Fla. Apr. 17, 2001); *United States v. Nicolosi*, 885 F. Supp. 50, 55-56 (E.D.N.Y. 1995). As one might expect, they have had little difficulty deeming saliva-swabbing procedures reasonable. *See, e.g., id*. I need not apply the *Schmerber* balancing test here inasmuch as the instant request founders at the "threshold" stage for lack of probable cause, or even reasonable suspicion.

persons of Everett and [R.C.], while contesting that such a showing even is necessary with respect to the taking of fingerprints. *See* Motion at 4 & n.2.

The government's arguments concerning the brevity and minimal intrusiveness of the contemplated swabbing and fingerprinting do not get it far. Even a very brief and minimally intrusive stop by a law-enforcement officer can constitute a "seizure" for Fourth Amendment purposes. *See, e.g., United States v. Arvizu,* 534 U.S. 266, 273 (2002) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."); *Arizona v. Hicks*, 480 U.S. 321, 327 (1987) ("We do not say, of course, that a seizure can never be justified on less than probable cause. We have held that it can – where, for example, the seizure is minimally intrusive and operational necessities render it the only practicable means of detecting certain types of crime.").

Nor has the government made a persuasive case that its request is analogous to a trial subpoena, assuming *arguendo* that a trial subpoena (like a grand-jury subpoena) does not constitute a "seizure." *See, e.g., Dionisio*, 410 U.S. at 9. Everett and [R.C.] are not being subpoenaed to appear before the grand jury or at trial; rather, the government seeks a court order directing them to appear before an ATF officer who would obtain their fingerprints and a swab of their mouths in aid of an arson investigation and prosecution. There can be no doubt that, had ATF agent McNeil transported Everett and [R.C.] to the police station to obtain the sought-after samples (or even briefly detained them roadside or in their homes to do so), he would have effectuated their "seizure" for Fourth Amendment purposes. *See, e.g., Davis v. Mississippi*, 394 U.S. 721, 726-28 (1969) (holding that detention of non-suspect at police station for purpose of obtaining fingerprints constituted "seizure" in violation of Fourth Amendment; expressing concern that "[i]nvestigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary

8

detention."); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996) ("obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns"); *Garrett*, 2001 WL 483785, at *1 ("The taking of a saliva sample constitutes a search and/or seizure within the meaning of the Fourth Amendment.").

Of course, in this case, McNeil did not simply detain [R.C.] and Everett at the police station or on the street: McNeil and the prosecution took the precaution of seeking this court's advance blessing. Nonetheless, the government has offered no argument or citation to authority persuading me that its commendable approach transforms the character of what it proposes to do: to detain Everett and [R.C.] involuntarily, however briefly, for what amounts to police investigative purposes. That, in my view, is a "seizure," for which the government (whether *ex post* or *ex ante*) bears the burden of demonstrating the requisite probable cause or, at the least, reasonable suspicion. *See, e.g., Kaupp v. Texas,* 538 U.S. 626, 630 n.2 (2003) ("We have . . . left open the possibility that, under circumscribed procedures, a court might validly authorize a seizure on less than probable cause when the object is fingerprinting.") (citation and internal quotation marks omitted); *Hayes v. Florida*, 470 U.S. 811, 817 (1985) ("There is . . . support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch."); *United States v. Ingram*, 797 F. Supp. 705, 706, 716-17 (E.D. Ark. 1992) (analogizing government's motion to take hair sample of robbery defendant then free on bail to taking of fingerprints; viewing motion "as a request to conduct what courts have described as a 'lesser intrusion'" that nonetheless "clearly must be conducted within limits imposed by the Fourth Amendment"; noting, "The compelled

9

appearance at a prosecutor's office or police station to provide a hair sample constitutes a limited type of seizure, a limited type of search, or both.") (footnote omitted).[4]

In any event, I find it significant that, in holding that grand-jury subpoenas do not constitute "seizures," the Supreme Court in *Dionisio* was careful to note that it needed to consider not only whether the subpoena itself constituted a seizure but also whether the grand jury's subsequent directive to make a voice recording so qualified. *See Dionisio,* 410 U.S. at 9. While the Court held that the voice-recording directive in issue there did not constitute a "seizure," *see id*. at 15, the proposed swabbing – and even fingerprinting – are palpably different, literally entailing a necessity to detain and touch the persons of Everett and [R.C.], *see, e.g., Kaupp*, 538 U.S. at 630 n.2 (presuming, in *dictum*, that detention to obtain fingerprints would constitute "seizure"); *Schlicher v. (NFN) Peters, I & I*, 103 F.3d 940, 942-43 (10th Cir. 1996) ("[T]he collection, analysis and storage of blood and saliva . . . is a search and seizure within the meaning of the Fourth Amendment.").

I turn to the government's alternative argument on the "seizure" front: that it has in fact established probable cause – that is, "probable cause to believe that the as yet unidentified DNA on the soda containers, as well as the fingerprint on the cigarette package, belongs to Everett and/or [R.C.]." Motion at 4 (footnote omitted). That may well be true, but it matters not. The government has shown no probable cause, or even reasonable suspicion, to believe that either Everett and/or

---

[4] The *Ingram* court perceptively analyzed the contemplated taking of a hair sample as a kind of prospective "*Terry* stop." *See Ingram*, 797 F. Supp. at 717. Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "[p]olice officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion, based on articulable facts, that a crime is about to be or has been committed." *United States v. Jones*, 432 F.3d 34, 40 (1st Cir. 2005). The *Ingram* court concluded that, in the circumstances presented, unlike in *Terry*, the government bore the burden of making out an *ex ante* showing of reasonable suspicion; the court underscored that it was not "authorizing stop-and-comb detentions." *Ingram*, 797 F. Supp. at 717. The court summarized: "Before compelling a person suspected of a crime to submit to the taking of a hair sample, the Court will require the government to show reasonable suspicion . . . that the suspect has committed the crime, and that the hair sample would connect the suspect to the crime he is suspected of committing. That showing will normally have to be made to a neutral judicial officer who, upon finding adequate cause, will issue an order directing the suspect to appear and submit to the taking of a hair sample at a convenient time." *Id*. at 717-18. I need not determine whether, in the instant case, a showing of probable cause or reasonable suspicion is required to justify the proposed seizure. The government purports to provide probable cause but falls short of meeting even the laxer standard.

[R.C.] was engaged in criminal activity; to the contrary, it has acknowledged that neither is a suspect in the *Noble* arson case. Even conceding, as counsel for the government argued, that Everett and [R.C.] are critical witnesses and that it would be extremely helpful to bolster their credibility via the sought-after DNA and fingerprint evidence, its trial-strategy worries fall well short of justifying the contemplated seizure of their persons. *See, e.g., Wilson v. City of Boston*, 421 F.3d 45, 56 (1st Cir. 2005) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.") (citation and internal punctuation omitted).[5]

The foregoing analysis is dispositive of the instant motion; however, I determine in the alternative that, with respect to the proposed taking of saliva samples, the government's request founders on the search prong as well. The government seemingly concedes that such an intrusion constitutes a "search" for Fourth Amendment purposes, *see generally* Motion; in any event, inasmuch as appears from my research, courts have readily so held, *see, e.g., Green v. Berge*, 354 F.3d 675, 676-77 (7th Cir. 2004); *Boling*, 101 F.3d at 1340; *Padgett v. Ferrero*, 294 F. Supp.2d 1338, 1342 (N.D. Ga. 2003), *aff'd sub. nom Padgett v. Donald*, 401 F.3d 1273 (11th Cir. 2005); *Shabazz*, 200 F. Supp.2d at 582-83; *Garrett*, 2001 WL 483785, at *1; *In re Grand Jury Proceedings Involving*

---

[5] In *United States v. Pakala*, 329 F. Supp.2d 178 (D. Mass. 2004), a non-grand-jury case cited by the government in its brief, *see* Motion at 3-4 & n.2, the court concluded that requiring three third-party individuals to provide their fingerprints or palm prints to the government might implicate their Fourth Amendment right to be free from unreasonable seizures but that the government had established probable cause to believe their palm prints and/or fingerprints would be found on stolen firearms that two named defendants were accused of having illegally sold. *See Pakala*, 329 F. Supp.2d at 181. *Pakala* is materially distinguishable in that, from all that appears, the third-party individuals were themselves suspected of commission of a crime. *See id.* at 180 ("Mr. Gonzalez [one of the defendants] has given a statement which implicates both he and Mr. Pakala [the other defendant] as well as the Third Party Individuals. The Third Party Individuals, who were not advised of their *Miranda* rights, gave statements to the police in which they admitted that they purchased the firearms."); *United States v. Iron Eyes*, 367 F.3d 781, 783 (8th Cir. 2004) (pursuant to 18 U.S.C. § 922(j), knowing possession of a stolen firearm is a crime).

*Vickers*, 38 F. Supp.2d 159, 165 (D.N.H. 1998); *Nicolosi*, 885 F. Supp. at 55; *but see Pakala*, 329 F. Supp.2d at 181 (assuming, for purposes of decision, that saliva swabbing constitutes "search" for Fourth Amendment purposes although issue was not "free from doubt").[6]

In this context as well, although for different reasons, the government's probable-cause showing misses the mark. Probable cause for a search is established to the extent that "there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." *Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978). At oral argument, counsel for the government conceded that no fruits or instrumentalities of a crime would be discovered by way of the proposed search; however, he contended that the search would yield evidence of Noble's alleged crime of arson inasmuch as (i) Everett and [R.C.] are critical witnesses against Noble, (ii) the defense can be expected to attack their credibility, (iii) a match between Everett's and/or [R.C.]'s DNA evidence and that discovered in the Fryeburg field would strongly corroborate their story that they were with Noble and Thibault in the field on the morning of the Gymnasium fire (particularly given the lack of any finding of the DNA of Thibault, the other witness against Noble, on the items tested from the field), and (iv) all of this in turn would bolster the credibility of the testimony that Noble confessed to the crime. Accordingly, counsel reasoned, the requested DNA sampling would constitute evidence of the crime of arson.

Whatever the outer bounds of the Fourth Amendment, it is not sufficiently elastic to stretch so far. The saliva samples the government seeks plainly are not "evidence of a crime," but rather

---

[6] I make no alternative ruling with respect to fingerprinting. Although, as discussed above, detention for purposes of fingerprinting clearly can constitute a "seizure" in certain circumstances, the Supreme Court appears to have signaled that obtaining a fingerprint exemplar does not constitute a "search." *See Dionisio*, 410 U.S. at 11, 15 ("[I]n *Davis* it was the initial seizure – the lawless dragnet detention – that violated the Fourth and Fourteenth Amendments, not the taking of the fingerprints. . . . [F]ingerprinting itself involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.") (citations and internal quotation marks omitted); *Vickers*, 38 F. Supp.2d at 164-65 (canvassing relevant Supreme Court caselaw on issue); *Johnson v. Massey*, No. 3:92 CV 178 (JAC), 1993 WL 372263, at *4-*5 (D. Conn. Sept. 17, 1993) (same). I need not resolve this issue for purposes of the instant decision.

evidence that tends to bolster other evidence that *is* evidence of a crime (Everett's and [R.C.]'s testimony). *Compare, e.g., Garrett*, 2001 WL 483785, at *1-*2 (permitting saliva-sample DNA search of defendant in circumstances in which government had shown probable cause to believe that fingernail left at crime scene was that of defendant).[7] Moreover, probable cause for a search of the body of a person must be "particularized with respect to" the individual to be searched. *Wilson*, 421 F.3d at 56 (citation and internal quotation marks omitted); *see also, e.g., Padgett*, 294 F. Supp.2d at 1342 ("With some narrowly defined exceptions, a search is not reasonable unless it is carried out pursuant to a judicial warrant issued on probable cause. In general, searches performed in the absence of a warrant and pursuant to an exception must be predicated upon probable cause to believe that the person to be searched has violated the law, or, at the very least, some quantum of individualized suspicion.") (citations and internal quotation marks omitted).[8] No such particularized showing has been made with respect to Everett or [R.C.]. The government cannot, consistent with the dictates of the Fourth Amendment, compel Everett and [R.C.], purportedly innocent third parties, to submit to a search for saliva/DNA for purposes of corroborating their testimony at trial.

---

[7] *Pakala*, in which the court permitted saliva swabbing of three third-party individuals on the basis that the government had established probable cause for that search, is (again) materially distinguishable in that the third-party individuals themselves evidently were implicated in commission of a crime (knowing purchase of stolen firearms). *See Pakala*, 329 F. Supp.2d at 181; *see also Iron Eyes*, 367 F.3d at 783. In those circumstances, as in *Garrett*, the DNA the government proposed to obtain, if matched to the DNA on the firearms as anticipated, would have constituted direct evidence of commission of a crime (not only illegal purchase of firearms by the third-party individuals but also their illegal sale by the two named defendants).

[8] The government does not suggest that one of the narrowly defined exceptions pertains in this case. *See generally* Motion. These exceptions include the "special needs doctrine," involving searches in furtherance of a special need beyond general law enforcement such as protection of the country's borders and maintenance of order within prisons. *See Padgett*, 401 F.3d at 1277; *see also, e.g., Green*, 354 F.3d at 677-78 (observing that special-needs searches, which "adopt a balancing of interests approach" rather than requiring that a search be undertaken pursuant to a warrant and upon probable cause, "have been held to include drug testing of railway executives, customs officers, probationers' homes and high school students participating in athletics.") (citations and internal quotation marks omitted).

### III.  Conclusion

For the foregoing reasons, and notwithstanding the proposed form of orders providing notice and an opportunity to object, the government's motion to compel Everett and [R.C.] to submit to fingerprinting and DNA testing (via swabbing of saliva) is **DENIED**.

So ordered.

Dated this 13th day of June, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge
